## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 25 2016, 6:45 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Stephen Miller
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Homer T. Richards,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 25, 2016

Court of Appeals Case No.
02A03-1604-CR-824

Appeal from the Allen Superior Court

The Honorable John F. Surbeck, Jr., Judge

Trial Court Cause No.
02D06-1509-F1-11

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Homer T. Richards (Richards), appeals his conviction for attempted murder, a Level 1 felony, Ind. Code §§ 35-41-5-1(a); -42-1-1

We affirm.

## ISSUES

Richards raises two issues on appeal, which we restate as follows:

(1) Whether the trial court coerced Richards into forfeiting his right to self-representation; and

(2) Whether the trial court abused its discretion by admitting a surveillance video-recording into evidence.

## FACTS AND PROCEDURAL HISTORY

On August 18, 2015, Richards and his girlfriend of several years, April Miller (Miller), ended their relationship. At the time, Miller worked as a manager at Cap n' Cork, a liquor store, located on Lewis Street in Fort Wayne, Allen County, Indiana. Approximately one week after her break-up with Richards, Miller began dating a long-time customer from Cap n' Cork—Peter Major (Major). Richards, however, continued to contact Miller on a regular basis, even showing up at her house at night uninvited. After obtaining permission from her district manager, Miller informed Richards that he was no longer permitted inside Cap n' Cork.

For several weeks, Richards adhered to this ban, although he regularly waited outside the store in an attempt to talk to Miller on her way to and from work. On September 21, 2015, Miller arrived at Cap n' Cork between 8:30 and 8:45 a.m. in order to open the store at 9:00 a.m. Once again, Richards was waiting for her outside the store, but Miller proceeded directly inside. Later that morning, Miller left the store to empty the garbage. Richards approached her and attempted to discuss a reconciliation. Miller explained that she had no interest in resuming their relationship, but Richards argued with her. Eventually, Miller "didn't want to listen to it anymore so [she] shut the door and went inside." (Tr. p. 148). Thereafter, Richards repeatedly attempted to call Miller on her cellphone, but Miller refused to answer. Despite his ban from the liquor store, Richards went inside and began yelling at Miller for not answering her phone. As Miller tried to carry on with her tasks, the two argued about Miller's refusal to reconcile and Richards' insistence that she quit her job because "he has been around there longer." (Tr. p. 151).

At approximately 12:30 p.m., Richards was still at Cap n' Cork, arguing with Miller. At this time, Miller's new boyfriend, Major, arrived at Cap n' Cork, along with his brother, John Tinker (Tinker). Major asked Richards, "[W]hy do you keep fucking with her, why don't you just leave her the fuck alone[?]" (Tr. p. 155). This inevitably led to an argument between Richards and Major, and upon realizing that Major was dating Miller, Richards invited Major to "go outside." (Tr. p. 193). Instead of exiting the store, Major punched Richards multiple times, knocking Richards to the ground. Tinker intervened and pulled

Major away from Richards. Major ordered Richards to leave the store, and despite the fact that Tinker was holding onto him, Major managed to knock Richards to the ground once more. As Richards stood, he stated that he would leave and walked out the door. However, a few minutes later, Major saw through the window that Richards was walking back toward Cap n' Cork—this time with a firearm in his hand. Before Major could lock the door, Richards pulled it open and was "[w]aving the gun around." (Tr. p. 158). He then aimed the gun at Major and fired twice; Major dropped to the ground.

[7] Miller rushed to Major's side while calling 911, as Tinker tackled Richards and snatched the gun away from him. Outside the liquor store, a customer, Domonic Holliday (Holliday), heard the gunfire and immediately ran inside. Unaware of who fired the shots, Holliday jumped on Tinker's back as Tinker wrestled with Richards. Assuming that Holliday was Richards' cohort, Tinker turned and hit Holliday in the head with the gun. Tinker chased Holliday out of the store and even pulled the trigger to shoot at him as he fled, but there was no ammunition left in the gun. As Tinker turned back toward the liquor store, Richards was running away. Tinker dropped the gun on the floor and checked on Major, who was struggling to breathe. Tinker then ran to his vehicle and drove off in an attempt to locate Richards, but the police apprehended Tinker and took him into custody for questioning.

[8] Major was transported by ambulance to Lutheran Hospital. He survived the shooting and was hospitalized for nearly two months. Major sustained a collapsed lung, and one of the bullets "traversed and injured his spinal . . .

column as well as his spinal cord." (Tr. p. 286). As a result, Major is now paralyzed from the chest down and requires ongoing therapy.

[9] During the investigation at Cap n' Cork, police officers retrieved the handgun—a 9mm Luger, as well as two shell casings and a tactical stainless steel knife. In addition, Miller informed the officers that Cap n' Cork was equipped with surveillance cameras and that a copy of the footage could be obtained from the main Cap n' Cork branch located on Coldwater Road in Fort Wayne.

[10] On September 25, 2015, the State filed an Information, charging Richards with Count I, attempted murder, I.C. §§ 35-41-5-1(a); -42-1-1; and Count II, aggravated battery, a Level 3 felony, I.C. § 35-42-2-1.5. The State also filed an Information for Application for Additional Fixed Term of Imprisonment (as Part II of Count II) based on Richards' use of a firearm in the commission of his aggravated battery offense, I.C. § 35-50-2-11. At his initial hearing on September 29, 2015, Richards indicated that he would be hiring private counsel, but no attorney ever entered an appearance. On October 9, 2015, Richards, acting *pro se*, filed a motion to suppress and a motion to dismiss. On October 14, 2015, while Richards' *pro se* motions remained pending, the trial court appointed a public defender to represent him, and on October 21, 2015, John C. Bohdan (Attorney Bohdan) filed his appearance as defense counsel.

[11] On November 30, 2015, Richards filed with the trial court a copy of a letter he had written to Attorney Bohdan. In his letter, Richards requested that Attorney Bohdan "please notify the court A.S.A.P. for a hearing for me to request

representing myself." (Appellant's App. p. 37). On December 3, 2015, Richards filed with the court a copy of another letter making the same request. On December 16, 2015, the trial court held a status hearing to discuss Richards' requests to proceed *pro se*. At the hearing, Richards initially indicated that he would be withdrawing his request to proceed *pro se*, but he subsequently informed the trial court that he wanted to represent himself because he has

> two (2) *pro se* motions in front of the [c]ourt that has [*sic*] good merits, and I asked [Attorney Bohdan] to move it [*sic*] into context. [Attorney Bohdan] said that he does not want to—once again, he does not want to pursue the matter the way that I was trying to lead him in as far as to get that information to the [c]ourt and alert the [c]ourt that we have a problem here today. [The State is] basing [its] case on false information, and [Attorney Bohdan] does not seem to want to pursue it.

(Status Hrg. Tr. p. 4) (Italics added). Based on Richards' intent to proceed *pro se*, the trial court advised him of his rights and of the pitfalls of self-representation. The trial court also informed Richards of its policy against appointing standby counsel. The trial court questioned Richards about his capabilities, and Richards indicated that he has his GED; he has done legal work in his prior cases; and he has some experience studying to be a paralegal. Richards also stated that he can read and write well; he is a good speaker; and he could quickly become familiar with the rules and procedures for his trial. Moreover, Richards verified that his decision to represent himself was not influenced by promises of special treatment or threats of harm. Richards articulated that he understood the disadvantages of self-representation but that

he wished to proceed *pro se*. However, after the trial court commenced a discussion about scheduling a suppression hearing, Richards privately consulted with Attorney Bohdan. As a result, both Attorney Bohdan and the trial court directed Richards that he needed to make a final decision about his representation. Richards determined that he was "going with [Attorney] Bohdan" and officially withdrew his request to proceed *pro se*. (Status Hrg. Tr. p. 15). The trial court subsequently returned Richards' *pro se* motions to suppress and to dismiss, stating that it does not accept *pro se* motions from represented defendants.

[12] On February 16-17, 2016, the trial court conducted a bifurcated jury trial. During the trial, to bolster the testimony of Miller, Major, and Tinker, the State offered the surveillance footage of the shooting as Exhibit 1. Richards objected to the admission of the video-recording based on his belief that it had been edited and was "not a true and accurate copy." (Tr. p. 163). The trial court admitted Exhibit 1 over Richards' objection. During his case-in-chief, Richards testified as to his version of events. He stated that after he was repeatedly punched by Major, he initially left the liquor store, but he was worried about Miller's safety because he believed that Major and Tinker were planning on robbing Cap n' Cork. Thus, he withdrew the firearm from his pocket and returned to the liquor store merely with the intent to ensure Miller's safety. Richards testified that Major charged at him with a knife, so he fired a warning shot in the opposite direction. Richards claimed that "the gun went off" a second time when Tinker tackled him, but he never intentionally fired a shot at

Major. (Tr. p. 389). At the close of the evidence, the jury returned a guilty verdict on both Counts. Thereafter, the jury made a separate determination that Richards used a firearm in the commission of the aggravated battery offense, thus warranting an additional fixed penalty.

[13] On March 15, 2016, the trial court held a sentencing hearing. The trial court merged the aggravated battery charge into the attempted murder charge and entered a judgment of conviction for attempted murder, a Level 1 felony. The trial court imposed the advisory sentence of thirty years, fully executed in the Indiana Department of Correction. In addition, during the sentencing hearing, Major accepted responsibility for his role in the altercation with Richards; thus, he requested that Richards pay for only one-half of his medical expenses. The trial court agreed and ordered Richards to pay $23,500 in restitution.

[14] Richards now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Right to Self-Representation*

[15] Richards claims that the trial court coerced him into forfeiting his right to self-representation by improperly advising him that he would not have access to legal materials. "The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to counsel." *Henson v. State*, 798 N.E.2d 540, 543 (Ind. Ct. App. 2003), *trans. denied*. This right is paramount because it "can affect a defendant's ability to assert all his other rights and because most defendants do not have the professional legal skills necessary to

represent themselves adequately." *Id.* at 543-44. However, "a State may not 'constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense.'" *Sherwood v. State*, 717 N.E.2d 131, 134 (Ind. 1999) (quoting *Faretta v. California*, 422 U.S. 806, 807 (1975)). Thus, the Sixth Amendment also affords a criminal defendant the right to forego the assistance of counsel and proceed *pro se*. *Henson*, 798 N.E.2d at 544. "The decision to proceed *pro se* must be made knowingly and intelligently because, by asserting this right, the defendant simultaneously waives his or her right to the assistance of counsel." *Dobbins v. State*, 721 N.E.2d 867, 871 (Ind. 1999). Nevertheless, "[t]he law 'indulges every reasonable presumption against a waiver of [the] fundamental right'" to counsel. *Henson*, 798 N.E.2d at 544 (quoting *Poynter v. State*, 749 N.E.2d 1122, 1126 (Ind. 2001)).

[16] As a prerequisite to claiming that the right to self-representation has been denied, a defendant must "clearly and unequivocally assert his right of self-representation." *Dobbins*, 721 N.E.2d at 871. Following such an assertion, the trial court must conduct a pre-trial hearing to determine whether the defendant is competent to proceed without counsel and to establish a record of the defendant's knowing and voluntary waiver of his right to counsel. *Id.* at 872. As our supreme court has stated, "[w]hen a defendant asserts the right to self-representation, the court should tell the defendant of the 'dangers and disadvantages of self-representation.'" *Poynter*, 749 N.E.2d at 1126 (quoting *Faretta*, 422 U.S. at 835). "There are no prescribed 'talking points' the trial

court is required to include in its advisement to the defendant;" rather, the trial court "need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver." *Id.* (quoting *Leonard v. State*, 579 N.E.2d 1294, 1296 (Ind. 1991)).

[17]  In this case, the trial court advised Richards, in relevant part, as follows:

> You have the right to be represented by a lawyer. On the other hand, you have the right to represent yourself, but to do so you must first give up your right to have a lawyer. In order for you to give up your right to a lawyer I must be sure that you fully understand what you're asking for and what you're giving up. . . . Count 1 is [a]ttempted [m]urder, a Level 1 [f]elony. . . . Level 1 carries a twenty (20) to forty (40) year term. A Level 3 [felony for aggravated battery] carries three (3) to sixteen (16) [years]. If the allegations pertain to the same victim they would—the [b]attery would merge in the [a]ttempted [m]urder, . . . [s]o really we're talking about an [a]ttempted [m]urder, a Level 1 [f]elony, twenty (20) to forty (40) year term. As you know it's the State's obligation to prove the elements of the crime beyond a reasonable doubt. A person charged as you are may have one (1) or more defenses. There are legal factors that may increase or decrease a sentence from an advisory sentence. An attorney has developed skills and expertise to prepare and present a defense to the criminal charges against you. Those attorney skills include investigating and interrogating witnesses; gathering documents and other kinds of written evidence; finding favorable witnesses and obtaining testimony; preparing and filing motions before trial; presenting favorable opening and closing statements; examining and cross examining witnesses; recognizing objectionable and unfavorable evidence and promptly objecting to its use; preparing appropriate jury instructions and presenting favorable sentencing information; and attacking unfavorable sentencing information should that be necessary. Drawing on these skills and related knowledge an attorney can analyze the

strength and weakness of the evidence for or against you and give you expert advice on the benefits of any of negotiating with the prosecutor for dismissal of some or all of the charges, or a favorable sentence in return for a plea of guilty. You must understand that if you decide not to have an attorney you will not receive any special treatment with your defense. You will have to follow all of the same legal rules and procedures in your case as an attorney would have. Remember the State is going to be represented by an attorney and will have the advantage of all the skill and experience that a trained lawyer can provide. You have the right to decide against having an attorney, but deciding not to have one can turn out to be a very bad decision. Experienced lawyers understand this when they are prosecuted, they are almost always—an experienced lawyer decides to be represented by another lawyer.[1]

(Status Hrg. Tr. pp. 5-8). The trial court added:

If I find that you understand your right to have a lawyer, that you understand the dangers and disadvantages of representing yourself, and that you have voluntarily decided to give up your right to a lawyer and wish to represent yourself, I will allow you to do so. Now, I need you to understand different courts do different things. Sometimes courts appoint standby counsel to assist *pro se* [d]efendants with the law. I've done enough reading [of] case law about those situations to understand that all that does is cause confusion among everyone, including the *pro se* [d]efendant and the lawyer who is trying his or her best to represent that *pro se* [d]efendant. It's never clear exactly where the line is of where the responsibility of the *pro se* [d]efendant ends and where the obligation of the standby counsel begins. So

---

[1] As Richards recognizes, the trial court's advisement generally follows the guidelines set forth in *Dowell v. State*, 557 N.E.2d 1063, 1066-67 (Ind. Ct. App. 1990), *trans. denied*; *cert. denied*, 502 U.S. 861 (1991), for establishing a knowing, intelligent, and voluntary waiver of a defendant's right to counsel.

> I do not appoint standby counsel. You will be on your own. The [c]ourt will issue subpoenas for you and see to it that they are served. I will not, nor will any court personnel do any investigation for you. [Attorney] Bohdan has access to investigators and folks to serve subpoenas and follow through on those sorts of things that you would not have if you were to represent yourself.

(Status Hrg. Tr. pp. 10-11) (Italics added). As previously mentioned, Richards initially indicated that he understood the risks of self-representation and wanted to proceed *pro se* regardless. However, when pressed to make a final decision (and after being advised that he could not continue to change his mind on this matter), Richards elected to maintain representation by Attorney Bohdan.

[18] Richards now contends that the trial court improperly advised him of the limitations surrounding his right to self-representation. Specifically, Richards argues that he was misled into believing that he would not have access to legal materials based on the court's advisement that it would not appoint standby counsel or provide investigatory assistance. Richards acknowledges that "a defendant who chooses to proceed *pro* se must accept the burdens and hazards incidental to his position." (Appellant's Br. p. 15). Nevertheless, he contends that "there is a constitutional right to have access to the courts and this right may be protected by the appointment of standby counsel, if standby counsel is not refused by the [d]efendant." (Appellant's Br. p. 15). Richards relies on *Engle v. State*, 467 N.E.2d 712, 714 (Ind. 1984), in which a trial court denied a *pro se* defendant's petition for direct access to legal materials. Our supreme court stated that "[t]he fundamental constitutional right of access to the courts

requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with law libraries or adequate assistance from persons trained in the law." *Id.* at 715. In the case of *Engle*, the supreme court concluded that the defendant's "right of access to the court was not undermined" because "[h]e had access to legal materials and legal assistance through his stand-by counsel." *Id.* Thus, according to Richards,

> [b]y summarily denying [him] the appointment of standby counsel, without determining [Richards'] access to legal material, simply because the court believed that standby counsel does nothing more than cause confusion among everyone, the court not only denied [Richards] definite access to the court but abused its discretion by summarily refusing standby counsel. Perhaps more accurately stated, the court failed to exercise its discretion as it failed to even consider the appropriateness of standby counsel in this specific case.

(Appellant's Br. p. 16).

[19]     We agree with the State that Richards' reliance on *Engle* is misplaced. Here, there is no indication in the record that Richards had been denied access to legal materials (*i.e.*, a law library) or that he would be if he elected to proceed *pro se*. Furthermore, the appointment of standby counsel, while "an appropriate prophylactic device" for a *pro se* defendant, is entirely within the trial court's discretion. *Sherwood*, 717 N.E.2d at 135 n.2; *Jackson v. State*, 441 N.E.2d 29, 33 (Ind. Ct. App. 1982). In fact, although Richards did not request the appointment of standby counsel, "a defendant who proceeds *pro se* has no right to demand the appointment of standby counsel for his assistance." *Sherwood*,

717 N.E.2d at 135 n.2 (Italics added).  Accordingly, we find that the trial court adequately apprised Richards "of the 'dangers and disadvantages of self-representation.'"  *Poynter*, 749 N.E.2d at 1126 (quoting *Faretta*, 422 U.S. at 835).  Based on the information he received, Richards was capable of making a knowing and intelligent decision, and he opted not to waive his right to counsel.  We conclude that the trial court did not coerce Richards into foregoing his right to self-representation.

## II.  *Admission of Evidence*

[20]   Richards next claims that the trial court abused its discretion by admitting into evidence the footage from Cap n' Cork's surveillance cameras (*i.e.*, State's Exhibit 1).[2]  The admission or exclusion of evidence is reserved to the discretion of the trial court.  *Mays v. State*, 907 N.E.2d 128, 131 (Ind. Ct. App. 2009), *trans. denied*.  On appeal, we review a trial court's evidentiary rulings only for an abuse of discretion.  *Id.*  It is an abuse of discretion if the trial court's "decision is clearly against the logic and effect of the facts and circumstances."  *Id.*

[21]   During the trial, the State offered Exhibit 1 into evidence through Miller.  As the store manager, Miller testified that she helped the police officers obtain a copy of the footage from its storage location at the Coldwater Road branch of Cap n' Cork.  Within half an hour of the shooting, Miller reviewed the footage with the officers at the liquor store.  She testified that it was a true and accurate

---

[2] Despite our best efforts, we were unable to access the files on the DVD.  Nevertheless, we find that we are able to resolve this issue without reviewing the surveillance footage.

copy of what had transpired. She further stated that, to the best of her knowledge, the footage had not been edited. Richards objected to the introduction of State's Exhibit 1 "as an overabundance of caution" because he believed that the video had been "edited . . . and that it is not a true and accurate copy." (Tr. p. 163). The trial court ruled that the State "laid a proper foundation" and admitted Exhibit 1. (Tr. p. 163).

[22] On appeal, Richards contends that the admission of the video recording "violated the best evidence principles and failed to comply with any exception to such principles." (Appellant's Br. p. 19). He further asserts that the video recording was not properly authenticated under the silent witness theory. Although Richards did not object to the admission of Exhibit 1 on these specific grounds during the trial, we will nevertheless address his arguments to the extent that they relate to his general objection that the video recording had been edited and was not a true and accurate portrayal of the events that it purported to depict. *See Warren v. State*, 757 N.E.2d 995, 999 (Ind. 2001) (noting that grounds not raised when evidence is presented at trial may not be raised for the first time on appeal).

[23] With respect to Richards' best evidence claim, he argues that the State failed to establish that Exhibit 1 "was not modified." (Appellant's Br. p. 19). The best evidence rule is codified in Indiana Evidence Rule 1002, which provides that "[a]n original writing, recording, or photograph is required in order to prove its content . . . ." *See Lawson v. State*, 803 N.E.2d 237, 240 (Ind. Ct. App. 2004), *trans. denied*. However, "[a] duplicate is admissible to the same extent as an

original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Ind. Evidence Rule 1003. During the trial, Richards vaguely indicated that he believed that Exhibit 1 was an edited copy of the recording, but he did not cite specific reasons to raise a genuine question as to its authenticity. He now points out, for the first time, that there is a discrepancy between the date the footage was purportedly obtained and the date that was used as a file name to save the footage on a DVD. He further argues that there was never "any showing that Exhibit 1 was compared to the initial video stored off site." (Appellant's Br. p. 19). Thus, Richards insists that the State failed to establish that Exhibit 1 was either an original or a duplicate of the original—*i.e.*, that it was not an edited version.

[24] We find no merit in Richards' argument. Richards had the opportunity at trial to ask preliminary questions regarding any discrepancy between the date of the footage and the date used in the file name on the DVD, but he never mentioned this as an issue. Instead, Richards simply asked Miller whether the "copy being offered here as an exhibit today[] is . . . a true and accurate copy of the sequence surrounding the shooting incident" and whether "there [had] been any editing done as it relates to this copy." (Tr. p. 163). As previously mentioned, Miller testified that the copy was a true and accurate depiction of events, and there was no editing done "to [her] knowledge." (Tr. p. 163). She explained that the surveillance footage was stored at the main Cap n' Cork location, and she assisted the police officers in retrieving a copy immediately following the shooting. Within approximately one-half hour following the shooting, Miller

and the police officers reviewed the footage together. Thus, we decline to reverse the trial court's evidentiary ruling based on Richards' best evidence argument.

[25] Richards also challenges the admission of the video-recording on the basis that it was not properly authenticated. Pursuant to "the 'silent witness' theory," a video recording may be admissible as substantive evidence as long as there is "a strong showing of [the videotape's] authenticity and competency." *Mays*, 907 N.E.2d at 131 (alteration in original) (quoting *McHenry v. State*, 820 N.E.2d 124, 128 (Ind. 2005)). The recording acts as a silent witness "as to what activity is being depicted." *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014) (quoting *Smith v. State*, 491 N.E.2d 193, 196 (Ind. 1986)). As such, a witness "is not required to testify that the [recording] is an accurate representation of the scene as it appeared—and indeed, often could not so testify since he or she was not necessarily there to observe the scene on that day." *Id.* (internal quotation marks omitted). In order to meet the heightened foundational requirements,

> "[t]here must be a strong showing of authenticity and competency" and . . . when automatic cameras are involved, "there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and changing of custody of the film after its removal from the camera."

*Wise v. State*, 26 N.E.3d 137, 141 (Ind. Ct. App. 2015) (ellipsis in original) (quoting *McHenry*, 820 N.E.2d at 128), *trans. denied*. "This standard is applied 'where there is no one who can testify as to its [the recording's] accuracy and

authenticity because the photograph must 'speak for itself' and because such a 'silent witness' cannot be cross-examined.'" *Id.* (alteration in original) (quoting *Edwards v. State*, 762 N.E.2d 128, 136 (Ind. Ct. App. 2002), *trans. denied*).

[26] Richards appears to acknowledge that the "silent witness" theory is not particularly applicable in this case in light of the fact that Miller was present as a witness during the event, and she testified as to the recording's accuracy and authenticity. Thus, the recording need not "speak for itself." *Id.* Nevertheless, Richards argues that Miller's "testimony does not account for the fact that during part of the [video recording] she was ducked down behind the counter and for at least that small segment she could not verify the accuracy of the [recording]." (Appellant's Br. p. 18). We note that Tinker testified at trial that he also watched the video, and he stated that it accurately depicted what occurred at the time Major was shot. Richards further challenges the integrity of the recording based on his own testimony during the trial that Major charged at him with a knife, which was not depicted in the footage. Although police officers retrieved a knife from the floor, Miller and Tinker both testified that they never saw Major with a knife, and Major testified that he had never seen the tactical knife that was recovered, and he never brandished a knife at Richards. Thus, Richards' self-serving testimony does little to convince our court that the surveillance footage was manipulated. Accordingly, we find no basis for reversing the trial court's ruling on authentication grounds. We conclude that the trial court did not abuse its discretion by admitting State's Exhibit 1.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly advised Richards of the disadvantages of self-representation and did not coerce Richards into foregoing his right to act *pro se*. We further conclude that the trial court acted within its discretion by admitting Exhibit 1 into evidence.

Affirmed.

Bailey, J. and Barnes, J. concur